IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 1:17-cv-00203-LTB

LOYD W. NEAL,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

    Defendant.

---

ORDER

---

Plaintiff, Loyd W. Neal, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal.

After consideration of the parties' briefs, as well as the administrative record, I AFFIRM the Commissioner's final order.

## I. STATEMENT OF THE CASE

Plaintiff is a 38 year-old veteran of the United States Army. [Administrative Record ("AR") 184, 199] He seeks judicial review of SSA's decision denying his application for DIB. Pl.'s Br., ECF No. 12 at 3. Plaintiff filed this application on November 30, 2012 alleging that his disability began on January 14, 2012. [AR 27]

1

The application was initially denied on June 25, 2013. [AR 120] The Administrative Law Judge ("ALJ") conducted an evidentiary hearing on November 13, 2013 and issued a written ruling on December 5, 2013. [AR 24–77] In that ruling, the ALJ denied Plaintiff's application on the basis that he was not disabled because, considering his age, education, and work experience, he had the residual functional capacity to perform jobs that exist in significant numbers in the national economy. [AR 37] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making SSA's denial final for the purpose of judicial review. [AR 728–30]; *see* 20 C.F.R. §404.981.

Plaintiff timely filed his complaint with this court seeking review of SSA's final decision. On October 30, 2015, I reversed and remanded the case back to SSA. *Neal v. Colvin*, No. 14-CV-01855-LTB, 2015 WL 5607831 (D. Colo. Sept. 24, 2015) (unpublished); [AR 734–53] The basis of my decision was that the ALJ erred by: (1) insufficiently considering certain medical records; (2) insufficiently analyzing the Veteran's Administration's ("VA") rating decision for Plaintiff; and (3) not giving due consideration to Plaintiff's credibility. [AR 740–53]

On remand, the same ALJ held an evidentiary hearing on April 26, 2016, and issued a second written decision dated June 9, 2016. [AR 645–708] The ALJ again ruled that Plaintiff was not disabled because through his date last insured, Plaintiff was capable of performing work that existed in the national economy. [AR 665–66] Plaintiff again appealed, and the SSA Appeals Council upheld the ALJ's decision. [AR 629–34] Plaintiff timely filed the current Complaint with this court seeking

review of the Commissioner's decision.

## II. RELEVANT MEDICAL HISTORY

The medical records begin with Plaintiff's therapy appointments with Clark Jennings, M.D. Plaintiff's interaction with Dr. Jennings continue throughout the record, and are summarized here. Dr. Jennings began seeing Plaintiff regarding his mental impairment beginning in 2008. [AR 623] The records of Dr. Jennings' appointments with Plaintiff begin on February 10, 2011. [AR 588] The records are relatively brief and regard Plaintiff's medication management. [*Id.*]

Plaintiff was, in part, assessed with PTSD with sleep agitation and daytime focus problems. [*Id.*] Dr. Jennings noted that Plaintiff appeared well-groomed, was edgy or fatigued, had mild depression or tension, a coherent thought process and no psychotic symptoms, oriented cognition, and competent memory. [*Id.*] The record noted a follow-up in four weeks, but the next record is on November 11, 2011, as an "urgent appointment as recommended by the patient's therapist, Jackie Grimmett." [AR 587]

Plaintiff was assessed with "PTSD with a history of sleep agitation, cognitive impairment, or associated mood disorder with some degree of manic features." [*Id.*] In his mental status evaluation, Dr. Jennings noted that Plaintiff appeared "dramatically dressed[,] much better than when I last saw him" with "mild psychomotor activation," moderate to severe emotional liability, oriented cognition, competent memory, and racing thoughts and distractibility. [*Id.*]

Dr. Jennings prescribed various medications, including the anticonvulsant

Depakote, the antidepressant Prozac, the anticonvulsant and analgesic neurontin, the sedative and insomnia drug Ambien, the antipsychotic Abilify, the antianxiety medication Xanax, and the antidepressant trazadone. [AR 583–85]

On February 16, 2012, Dr. Jennings noted that it was "increasingly obvious this individual suffers from rather severe chronic mental illness" and that Plaintiff exhibited "a rather chronic mild to moderate thought disorder with paranoid and religious trends." [AR 585] Dr. Jennings noted mixed success with medications. [AR 580, 583–85]

On November 7, 2012, Dr. Jennings' noted in Plaintiff's mental status evaluation that he was much better groomed with a "Native American" appearance, pleasant behavior, minimally anxious dysphoria affect, improved thought organization, no imminent dangerousness, oriented cognition, mild distractibility, and competent memory. [AR 580]

On November 21, 2013 Dr. Jennings completed a mental impairment questionnaire where he diagnosed Plaintiff in part with bipolar I, PTSD, and insomnia disorder. [AR 623] In describing the clinical findings which justify his diagnosis of Plaintiff, Dr. Jennings noted "colorful Native American garb," moderate anxious affect with occasional flight of ideas, and cyclic manic symptomology. [*Id.*] On a list of mental abilities needed for unskilled or semiskilled work, Dr. Jennings mostly noted that Plaintiff would be unable to meet competitive standards. [AR 625–26] Dr. Jennings checked boxes that stated Plaintiff would be absent from work more than four days per month (the greatest option); that Plaintiff's

impairment would last over twelve months; that Plaintiff was not malingering; and that Plaintiff's impairments were reasonably consistent with his symptoms and functional limitations. [AR 627]

Additional records were added after SSA's initial denial. On April 8, 2014, Dr. Jennings wrote that Plaintiff "[i]ntermittenly struggles with mild depression, episodes of sleep instability, and episodes of irritability. In many ways patient feels like he is coping much more effectively." [AR 888] The final record is from October 2014 when Plaintiff presented with acute grief due to the loss of his son. [AR 889] Dr. Jennings prescribed Kolopin instead of Xanax regarding Plaintiff's stress. [*Id.*]

Concerning a prior SSA disability filing, on February 24, 2011, Dowin H. Boatwright, M.D. completed a consultative exam on Plaintiff. [AR 311] Plaintiff presented with complaints of: (1) a traumatic brain injury; (2) posttraumatic stress disorder ("PTSD"); (3) a left shoulder injury; and (4) temporomandibular joint disorder. [*Id.*] Dr. Boatwright noted that Plaintiff submitted no medical records for him to review. [AR 311]

Dr. Boatwright explained that Plaintiff

was pleasant, cooperative, and in no acute distress. He appeared to sit comfortably during the exam and without pain-mitigating movements. He did not appear uncomfortable getting on and off the examination table, removing shoes, and arose spontaneously and unaided from a seated position without discernible discomfort. He appeared his stated age, was appropriately dressed and groomed, and remained appropriate throughout. He did not appear particularly anxious, agitated, or drowsy and responded appropriately with adequate effort throughout. He appeared to have no difficulty with hearing during our discussion and speech was clear and coherent.

[AR 312] Concerning the traumatic brain injury and PTSD diagnoses, Dr.

Boatwright recommended that Plaintiff follow up with specialists. [AR 314]

Dr. Boatwright provided a function assessment and wrote that "[t]here are no recommended limitations on the number of hours that the patient is able to sit, stand, or walk. There are no manipulative or environmental limitations recommended. Postural limitations include abducting greater than 130 degrees. The patient should be able to lift twenty pounds continuously, twenty five pounds frequently, [and] up to fifty pounds occasionally." [*Id.*]

Also on February 24, 2011, R. Terry Jones, M.D. examined Plaintiff. [AR 315] Dr. Jones reviewed Plaintiff's medical and psychiatric records and noted that Plaintiff presented with, in part, traumatic brain injury and PTSD. [*Id.*] Regarding symptoms of PTSD, Dr. Jones noted that Plaintiff had "nightmares and night terrors several times a week, some flashbacks during the day in terms of intrusive thoughts, hypervigilance, exaggerated startle response, increased irritability and ease of anger and avoidance of large crowds." [AR 318] Dr. Jones noted in his conclusion that Plaintiff, while on a tour of duty in Iraq, suffered a number of traumatic events, resulting in PTSD. [AR 319]

Dr. Jones added that Plaintiff "does have crying spells at least once a week, no suicidal ideation or history of suicide attempts, no significant anhedonia, but he does have some mild anergy." [*Id.*] Plaintiff did not identify with feelings of helplessness, hopelessness or worthlessness, nor presented with symptoms of psychomotor retardation. [*Id.*] He also noted that Plaintiff was "managing his own money and paying his own bills and he appears to be capable of doing so based upon

this evaluation." [*Id.*]

In November 2011, Plaintiff began to receive home care through the VA. [AR 488–89] Melody Hernandez, Plaintiff's partner, became the primary family caregiver. [*Id.*] Generally, the assistance needed related to mental difficulties in daily life, such as sleep management, planning and organizing, delusions, recent memory lapse, and self-regulation of moods. [AR 501–03]

In August 2013, Jill Watson, M.D. completed a disabled person parking application for Plaintiff as "he [could not] walk 200 feet without rest and is limited overall in [his] ability to walk due to arthritis condition." However, Dr. Watson added that Plaintiff also marked that he could not walk without support, such as a cane, but that he had walked into and out of the clinic without aid, so it did not apply. [AR 443]

On January 14, 2013, Melissa A. Polo-Henston, PsyD performed a compensation and pension exam in regards to Plaintiff's application for VA benefits. [389–90] Dr. Polo-Henston reviewed Plaintiff's VA medical files and performed the analysis related to Plaintiff's PTD and traumatic brain injury. [AR 390]

Dr. Polo-Henston noted in her claim review that Plaintiff was evaluated in 2009 "with anxiety, anger and depression, and increased alcohol use. He had a traumatic brain injury screen which was deemed to be negative on June 16, 2006. He was referred to behavioral health on June 6, 2008 and diagnosed with posttraumatic stress disorder." [*Id.*] Dr. Polo-Henston added that in April 2010 Plaintiff had a traumatic brain injury evaluation (named the St. Louis University

Mental Status Exam) and scored 26 out of a possible 30, indicating that his score was within normal limits. [*Id.*] In Dr. Polo-Henston's mental status exam, Plaintiff took the same test and received a score of 22 out of 30, "which is unusual to see in a younger person." [AR 392]

Dr. Polo-Henston noted that Plaintiff "appeared his stated age, had tattoos and Native American jewelry and symbols. He was casually dressed and neatly groomed. His affect was normal. His speech was normal rate, tone, and pressure. His eye contact is good. His thought process is linear and goal directed." [*Id.*]

Dr. Polo-Henston noted that Plaintiff did not make a good effort on various neuropsychological tests. [AR 393] In her assessment, Dr. Polo-Henston stated that Plaintiff still presented symptoms of PTSD, but they were successfully stabilized with medication and therapy. [AR 394] She added that Plaintiff was "able to work but requires a supportive environment where his mental health issues are understood." [*Id.*] Dr. Polo-Henston did not find Plaintiff to have a traumatic brain injury, but did find that due to his PTSD, Plaintiff

> is able to maintain activities of daily living including personal hygiene. He has not experienced significant trauma over the last year. There has not been worsening of his condition. There have not been remissions; symptoms are continuous. He does not have problems with drug and alcohol abuse at this time. There is not inappropriate behavior. He is in treatment and has responded. Medications are present and have been helpful. Thought process and communication are not impaired. Social functioning is impaired, as [Plaintiff] has difficulty with being stimulated in crowds. Employment is somewhat impacted due to psychological issues, as the Veteran has not worked since he discharged. He has attempted school several times. He has difficulty with crowds and gets overwhelmed easily and needs a supportive environment. The Veteran denies postmilitary stressors. Other than the diagnoses listed, no other mental conditions were

found. The Veteran is competent to handle VA funds.

[*Id.*]

On January 25, 2013 by referral from Mary Louise Langlois, M.D., radiologist Gregory R. Wein found no "fracture, dislocation or bone destruction" in Plaintiff's right knee, but noted an abnormality that needed medical attention. [AR 321]

Four days later, Dr. Langlois performed a compensation and pension exam in regards to Plaintiff's application for VA benefits. [AR 349–50] Dr. Langlois reviewed Plaintiff's VA medical files and noted knee and lower leg issues. [AR 350, 352] Dr. Langlois added five other diagnoses, but none specifically regarding the right knee. [AR 354–55]

In the examination report, Dr. Langlois noted in part that a "right knee joint strain with infrapatellar tendonitis" meant that Plaintiff was "able to do sedentary work which accommodates for frequent breaks to get up and move around." [AR 356–57] In a specific questionnaire regarding knee and lower leg conditions, Dr. Langlois noted that she reviewed Plaintiff's VA file and performed an in-person examination. [AR 357–58] She diagnosed infrapatellar tendonitis and patellofemoral pain syndrome, both in the right leg. [AR 359]

Dr. Langlois found that Plaintiff had a post-test flexion of 135 degrees with no limitation of hyperextension. [AR 363] For the right knee, she noted pain on palpation and movement, and less movement than normal. [AR 365] She noted normal strength in Plaintiff's right knee flexion, extension, anterior instability, posterior instability, and medial-lateral instability. [AR 366–67] She did not check the box noting that Plaintiff used a cane. [AR 371–72] She additionally noted that

imaging studies of the knee had been performed, but checked "no" next to the following options: degenerative or traumatic arthritis; x-ray evidence of patellar subluxation; and any other significant diagnostic test findings or results. [AR 373]

Under "functional impact," Dr. Langlois noted that Plaintiff's knee condition made it such that he was unable to ambulate without pain and needed to be in sedentary job, but that even in a sedentary job he would need to change positions every 15 or 20 minutes because his knee aches if it is in the same position over time. [AR 374]

In April 2013, Jackie Grimmett, PsyD, LPC, wrote a letter concerning the therapy sessions that Plaintiff had with her. [AR 573] Dr. Grimmett noted that Plaintiff was motivated for treatment, but struggled to attend "due to memory issues and a general chaos that characterized his life." [*Id.*] She added that Plaintiff "maintained a high level of distress and struggled to function optimally in everyday life. His judgment was prone to impairment and he did not always think things through before engaging in behaviors." [AR 573–74]

On June 8, 2013 Christopher Davis, D.O. performed a disability-related consultative exam on Plaintiff. [AR 602] Dr. Davis noted that Plaintiff was diagnosed with

> patellar tendonitis, for which he has undergone steroid injections and physical therapy, which have not significantly relieved his pain. He [was] recommended to have some surgery, but has opted out to this point. He describes constant pain on a daily basis that is worsened with walking or prolonged sitting. On the really bad days when his pain is the worst he sometimes uses a cane to help aid in his ambulation.

[AR 603]

In commenting on Plaintiff's physical appearance during the exam, Dr. Davis stated that Plaintiff was

> very pleasant and participated appropriately. He was talkative and alert. He was not anxious, tremulous, agitated or drowsy. He sat comfortably during the exam with no pain-mitigating movements. He displayed ease getting on and off the table and removing his shoes. He arose spontaneously from a seated position unaided with no discernible discomfort arising. He responded appropriately to all questions with a normal effort. There were no inconsistencies, vague answers or tangential thoughts during the exam. He appeared appropriately groomed and dressed with a normal mood and affect. His ambulation appeared normal. He appeared his stated age with a normal body habitus. He was able to hear normal conversation and his speech was clear and coherent. He did not have difficulty manoeuvring secondary to visual deficits today.

[AR 604] Concerning coordination, Dr. Davis noted that Plaintiff's "ambulation appeared normal through all phases of the gait cycle. He was able to stand and walk on his heels, and only able to briefly stand on his toes, but not walk due to pain in his right knee." [AR 606] Dr. Davis noted that Plaintiff had "[m]ild discernable discomfort at the right knee." [*Id.*] Additionally, Dr. Davis' examined Plaintiff's right knee and noted in part that there was "specific point tenderness of the patellar tendon without palpable abnormality of the bony structures or tendon." [AR 607] In relevant part, Dr. Davis diagnosed chronic right knee pain and PTSD. [*Id.*]

In his functional assessment, Dr. Davis stated that Plaintiff should be able to stand or walk six hours of an eight-hour workday, but should only stand or walk continuously for 30 to 40 minutes. [AR 608] Dr. Davis suggested only occasional squatting, crouching, or stooping maneuvers as those movement exacerbated Plaintiff's right knee pain during the exam. [*Id.*] Dr. Davis also suggested limiting frequent maneuvering on stairs and occasional maneuvering on ladders due in part

to Plaintiff's right knee pain. [*Id.*]

### III.    LEGAL STANDARDS

#### A.  SSA's Five-Step Process for Determining Disability

A claimant is "disabled" under Title II of the Social Security Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). SSA has established a five-step sequential evaluation for determining whether a claimant is disabled and thus entitled to benefits. 20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity." If he is, benefits are denied and the inquiry stops. 20 C.F.R. § 404.1520(b). At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If he does not, benefits are denied and the inquiry stops. If he does, SSA moves on to step three, where it determines whether the claimant's impairments "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity

("RFC")—that is, what he is still able to do despite his impairments—and asks whether the claimant can do any of his "past relevant work" given that RFC. 20 C.F.R. § 404.1520(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows him to do other work in the national economy in view of his age, education, and work experience. 20 C.F.R. § 404.1520(g). At this step, SSA's "grid rules" may mandate a finding of disabled or not disabled without further analysis based on the claimant's age, education, and work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2.

In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003).

### B. Standard of Review

My review concerns only whether SSA's factual findings are supported by substantial evidence and whether the correct legal standards were applied. *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015). With regard to the law, reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Kellams v. Berryhill*, 696 F. App'x 909, 911 (10th Cir. 2017). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).

"Substantial evidence is more than a mere scintilla and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Razo v. Colvin*, 663 F. App'x 710, 713 (10th Cir. 2016). The record must demonstrate

that the ALJ considered all of the evidence, but an ALJ is not required to discuss

every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I

examine the record as a whole and may not reweigh the evidence or substitute my

judgment for that of the ALJ. *Razo*, 663 F. App'x at 713.

## IV.    THE ALJ'S RULING

In her ruling, the ALJ first noted why I remanded the case back to her. [AR

648] She wrote that the order directed her to: (1) provide a better explanation of the

weight accorded Dr. Langlois' opinions, particularly those regarding Mr. Neal's need

to change positions and take breaks; (2) address the discrepancy between the VA's

rating decision and the weight she gives to the rating decision, along with other

relevant aspects of the VA decision; and (3) fully address Plaintiff's testimony

regarding his anger issues and any impact those issues have on his RFC. [*Id.*]

The ALJ followed the five-step analysis outlined above. The ALJ concluded

under the first step that Plaintiff had not engaged in substantial gainful activity

during the period from alleged onset date of January 14, 2012 through his date last

insured of December 31, 2014. [AR 651] Under step two, the ALJ determined that

Plaintiff had the "following severe combination of impairments: degenerative joint

disease in the left shoulder, degenerative joint disease in the right knee, post-

traumatic stress disorder, and bipolar disorder." [*Id.*]

The ALJ concluded under step three that the enumerated severe

impairments did not meet or medically equal an impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (the "Listing"). [AR 652] The ALJ found that Plaintiff had the RFC to perform light work except that he is limited in that he can

> occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry to 10 pounds; can stand and/or walk for 6 out of 8 hours; sit for at least 6 out of 8 hours; is able to occasionally climb ladders and frequently climb stairs; has no limitations on the ability to balance or stoop, and can frequently kneel, crouch, and crawl; can occasionally reach overhead with the dominant left upper extremity, but has no other manipulative limitations and no environmental limitations. The claimant is able to understand, remember, and carry out moderately complex instructions that can be learned and mastered within three months; can sustain concentration, persistence, and pace for these instructions in a low stress environment. Low stress is defined as social interaction [that] should not be frequent or prolonged. In this environment, the claimant can tolerate supervision, work changes, can plan or set goals, can travel, and recognize and avoid work hazards.

[AR 653–54]

The ALJ found that Plaintiff is unable to perform past relevant work, fulfilling step four. [AR 665] In the fifth and final step, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. [AR 665–66] The ALJ supported his decision based in part by the testimony of the VE and related hypotheticals, and found that Plaintiff could be a small product assembler, cleaner, or router clerk. [AR 666] Thus, the ALJ concluded that Plaintiff is not disabled. [*Id.*]

After Plaintiff's claim was denied, Plaintiff argued to the SSA Appeals Council that the ALJ did not sufficiently comply with my original order in part because she did not evaluate Dr. Jennings' records as a treating source opinion. [AR 843] In fact, Plaintiff noted that in the ALJ's recent decision, she did not directly

acknowledge that further evaluating Dr. Jennings' records and opinion was part of my order. [AR 844].

In response, the Appeals Council noted that the ALJ did not indicate as a reason for remand that she must "address a November 5, 2013 treatment record and Mental Impairment Questionnaire from Dr. Jennings. . . ." [AR 630] However, the Appeals Council found that in her decision, the ALJ sufficiently complied with my order. [*Id.*] The Appeals Council reasoned that the rationale behind the ALJ's decision to discount the weight given to Dr. Jennings' opinion was supported by substantial evidence. [AR 631]

## V.    ISSUES ON APPEAL

In appealing the ALJ's decision, Plaintiff argues that the ALJ erred by: (1) making findings of fact regarding Plaintiff's RFC that were not supported by substantial evidence; (2) improperly weighing the opinions of Plaintiff's treating physician; and (3) improperly determining Plaintiff's credibility.

### A.  The ALJ's findings of fact in determining Plaintiff's RFC

Plaintiff argues that the ALJ did not sufficiently address Plaintiff's limitations for breaks, changing of positions, and limits in Plaintiff's ability to walk, stand, and sit. ECF No. 12 at 9–10. Specifically, Plaintiff contends that the ALJ improperly ignored evidence that proved that Plaintiff needed to be able to change positions on a frequent basis. *Id.* at 14.

Plaintiff argues that two examining physicians, Drs. Davis and Langlois, determined that Plaintiff "has a knee condition which requires him to change positions on a fairly frequent basis" and such limitation was not included in the

ALJ's RFC determination. *Id.* at 11. Plaintiff continues that the ALJ improperly substituted her own lay opinions—in lieu of relying on the opinion of medical experts—on the effects of Drs. Davis and Langlois' medical findings. *Id.* at 12. Further, Plaintiff argues that the ALJ's reliance on the opinion of Dr. Boatwright was not supported by substantial evidence. *Id.* at 13.

In formulating a claimant's RFC, "the ALJ must give consideration to all the medical opinions in the record." *Paulsen v. Colvin*, 665 F. App'x 660, 664 (10th Cir. 2016) (citing 20 C.F.R. § 404.1527(c)). However, an "ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Jimison ex rel. Sims v. Colvin*, 513 F. App'x 789, 794 (10th Cir. 2013) (quoting *Clifton v. Chater*, 79 F.3d at 1009–10.

### 1. *Dr. Langlois' Opinion*

As required in my past order remanding this case, the ALJ provided greater context for her reasoning concerning Dr. Langlois' opinion. [AR 657–59] The ALJ noted the review of the medical record by Dr. Langlois, as well as Dr. Langlois assessing the functional impact of each alleged impairment. [AR 657–58] The ALJ recognized Dr. Langlois opinion that Plaintiff

> is able to do ambulatory work, which accommodates for no overhead lifting or reaching. Veteran is limited in carrying 15 pounds. Due to his right knee infrapatellar tendonitis and patellofemoral pain syndrome, left knee strain with infrapetellar tendonitis, and bilateral pes cavus with plantar fasciitis, the veteran is able to do sedentary work, which accommodates for frequent breaks to get up and move around. Due to

the recurrent temporomandibular joint dysfunction, status post right hand pinky boxer's fracture and residual left shoulder arthroscopy port scars, the veteran is not limited in his ability to do any work for which he is otherwise qualified . . . .

[AR 658]

The ALJ decided to give this opinion little weight because Dr. Langlois "relied on the claimant's reports of limitations on sitting for extended periods," and her "assessment did not measure his functional capacity over time and no objective findings establish the necessity of alternating from a seated position every 15-20 minutes." [*Id.*] The ALJ noted that Dr. Langlois "was not a treating provider and relied heavily on the claimant's self-reports of pain and limitations and few positive findings of any significance were observed by her during her evaluation of the claimant's functioning." [AR 659] Additionally, Dr. Langlois' opinion was based on a single exam and a review of the applicable medical records. [AR 357–58, 659]

The ALJ pointed to evidence in the medical record which conflicts with Dr. Langlois' opinion. [AR 659] This evidence includes a treatment record from six months before Plaintiff saw Dr. Langlois which "showed that he was well developed, in no acute distress, alert and oriented, had a negative musculoskeletal exam and was noted to move all extremities equally well." [AR 447–48, 659] She noted evidence of a doctor discounting Plaintiff's assertion that he could not walk without a cane because the doctor saw him "walk in and out of the clinic without aid. . . ." [AR 659]

As outlined in part under 20 C.F.R. 404.1527(c)(3), the ALJ will give more weight to a medical opinion supported by relevant evidence, especially "medical

signs and laboratory findings." Here, the ALJ properly supported her opinion of giving little weight to Dr. Langlois by pointing to specific instances in the medical record and Dr. Langlois' own treatment notes that contradicted Dr. Langlois' opinion. *See Bell v. Colvin*, 645 F. App'x 608, 613–14 (10th Cir. 2016) (holding that the ALJ permissibly afforded little weight to doctor whose opinion was inconsistent with the doctor's own notes). Therefore, substantial evidence supported the weight the ALJ gave to Dr. Langlois' opinion.

### 2. *Dr. Davis' Opinion*

Plaintiff faults the ALJ for discounting the findings of the consultative examiner Dr. Davis. Dr. Davis found in part that Plaintiff "should be able to stand or walk continuously at one time [for] probably 30 to 40 minutes." [AR 608] The ALJ assigned moderate weight to Dr. Davis' opinion, but stated that there was "little in the record that supports the claimant's allegations of being unable to stand and walk for prolong[ed] periods, or sit for more than [one] hour." [AR 664] Plaintiff argues that the ALJ erred by not including this limitation in her RFC determination. ECF No. 12 at 11.

The ALJ sufficiently justified the weight she gave to Dr. Davis' opinion. The ALJ noted that the opinion was rendered after a thorough examination. [*Id.*] However, she discounted the sitting and standing requirements because "[a]s noted above there [were] no medically determinable impairments that would cause these limitations." [*Id.*] Indeed, the lengthy explanation she provided concerning Dr. Langlois' opinion dealt heavily with the lack of objective evidence in the record

concerning Plaintiff's inability to stand or walk for prolonged periods. [AR 657–59]

The ALJ stated that the "record is void of evidence that supports the medical necessity of the claimant having to stand and walk around every 15 to 20 minutes" and that this "frequent positional change is not supported by the totality of the record." [AR 658–59]  The weight given to Dr. Davis' opinion by the ALJ, and her reasoning for doing so, are supported by substantial evidence. *See Endriss v. Astrue,* 506 F. App'x 772, 776–77 (10th Cir. 2012) (holding that ALJ did not err in providing sufficient reasons for giving different weights to certain parts of a medical opinion and in doing so, the ALJ need not repeat evidence from earlier in his or her decision).

### 3. Dr. Boatwright's Opinion

Plaintiff disputes the significant weight given to Dr. Boatwright's opinion. Plaintiff argues that Dr. Boatwright's opinion was based on a "one-time evaluation" in February 2011, which was prior to Plaintiff's disability date. ECF No. 12 at 13 and No. 14 at 2. Plaintiff argues that Dr. Boatwright's opinion was not based on a review of relevant records and did not consider Plaintiff's degenerative joint disorder in his right knee. ECF No. 12 at 14. Finally, Plaintiff claims that "Dr. Boatwright's conclusion there were no physical limitations conflicts with every other examining or treating medical provider," and specifically conflicts with the opinion of Dr. Watson. *Id.*

In her explanation of the weight given to Dr. Boatwright, the ALJ noted that the "opinion was rendered after a thorough examination of the claimant," and that

although "this exam was performed some time ago, nothing in the subsequently introduced medical evidence persuasively suggests any more significant limitations or worsening of the claimant's physical condition." [AR 663] The ALJ found that the opinion was consistent with "Dr. Boatwright's own exam findings, the objective diagnostic evidence, the exam findings of other providers, and the claimant's treatment history." [*Id.*] The ALJ was "inclined to give the claimant some benefit of the doubt" when she limited Plaintiff to light work. [*Id.*]

The ALJ's decision was supported by substantial evidence. As discussed *supra*, the ALJ provided lengthy review of the evidence concerning degenerative joint disease in Plaintiff's right knee and the related issue of frequent position changing. [AR 658–659] This supports her statement that, even though Dr. Boatwright's exam was done in 2011, there was not subsequent evidence that his condition worsened. [AR 663] As explained throughout this Order, the evidence that *may* have shown a worsening of the condition—in the form of Drs. Langlois and Davis' opinions and Plaintiff's subjective comments—were properly discounted by the ALJ.

Dr. Boatwright did not directly mention Plaintiff's degenerative joint disorder in his right knee, as it was not noted under the list of chief complaints and allegations. [AR 311] Dr. Boatwright did note that Plaintiff "did not appear uncomfortable getting on and off the examination table, removing shoes, and arose spontaneously and unaided from a seated position without discernible discomfort." [AR 312]

Concerning Dr. Boatwright's opinion conflicting with Dr. Watson's opinion, the ALJ properly discounted Dr. Watson's opinion, noting that the opinion was not explained in detail and there were "no medically determinable impairments that would limit the claimant's ability to walk or stand." [AR 663] The ALJ continued that "exams have revealed normal gait and station, and no difficulty walking (although toe walking was limited)." [*Id.*] This is accompanied by cites to the record which show this. [AR 313, 604–05]

Even if Dr. Boatwright did not review medical records, this accords with SSA regulations in evaluating opinion evidence in that "the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). Therefore, substantial evidence supports the weight given by the ALJ to Dr. Boatwright's opinion.

### B.  The ALJ's weighing of Plaintiff's treating physician's opinion

Plaintiff argues that the ALJ is required to give the opinions of the Plaintiff's treating physician, Dr. Jennings, "substantial controlling weight unless there is good cause to disregard the treating physician's opinions." ECF No. 12 at 15. Plaintiff argues that if a treating physician is not given controlling weight, the ALJ must analyze six factors set forth in 20 C.F.R. § 404.1527(2) to determine the appropriate weight for the treating physician's opinion. *Id.* Plaintiff continues that even if the treating physician's opinion is not entitled to controlling weight, applicable SSA rulings dictate that the opinion is still entitled to deference and must be weighed by the six factors. *Id.* at 16. Plaintiff argues that Dr. Jennings' opinion was not analyzed in accordance with the six factors, and if it was, the

opinion "was entitled to, if not controlling weight, then the greatest weight." *Id.*

Additionally, Plaintiff argues that by not giving proper weight to Dr. Jennings' opinion, the ALJ erred because she did not submit proper hypothetical questions to the VE regarding Plaintiff's need for frequent breaks. *Id.* at 20.

"A treating-source opinion concerning the nature and severity of a claimant's impairment is entitled to controlling weight provided it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Paulsen v. Colvin*, 665 F. App'x 664 (quoting 20 C.F.R. § 404.1527(c)(2)) (alterations omitted). The weight the ALJ assigns to a treating physician "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5 (Jul. 2, 1996).

If the ALJ declines to give a treating-source opinion controlling weight, she must then determine what weight to give the opinion using the factors in 20 C.F.R. § 404.1527(c)(2)(i), (c)(2)(ii), and (c)(3) through (c)(6). *Paulsen v. Colvin*, 665 F. App'x at 664. Under SSR 96-2p, all these factors must be weighed by the ALJ in determining the treating-source opinion's weight. SSR 96–2p, 1996 WL 374188, at *4 (Jul. 2, 1996). However, the ALJ need not explicitly discuss each factor. *Armijo v. Astrue*, 385 F. App'x 789, 795 (10th Cir. 2010); *see Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("That the ALJ did not explicitly discuss all the [20 C.F.R. § 404.1527(c)] factors for each of the medical opinions before him does not

prevent this court from according his decision meaningful review.").

In the case that a treating physician's report is inconsistent with other medical evidence, the ALJ must determine that the medical evidence outweighs the treating physician's report, "not the other way around." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (quoting *Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir. 1988)). An ALJ may give no weight to a treating physician, but in doing so she must give specific, legitimate reasons. *Paulsen v. Colvin*, 665 F. App'x at 667.

It is true that the ALJ did not specifically acknowledge that I remanded Plaintiff's case to analyze Dr. Jennings' records. Additionally, it is true that the ALJ could have been more thorough in her analysis of Dr. Jennings' records. However, based on a detailed review of the record coupled with the analysis provided by the ALJ, I find that the ALJ's reasoning was supported by substantial evidence.

For example, the ALJ mentioned that Dr. Jennings noted he had seen Plaintiff "monthly to semi-annually since 2008," and that the ALJ simply stated that Dr. Jennings "completed a mental impairment questionnaire in November of 2013, which was no [sic] submitted until February 2014." [AR 623, 665] This is likely not the explicit examination of 20 C.F.R. § 404.1527(c)(2)(i)—concerning the length of the treatment relationship and the frequency of examination—for which Plaintiff is asking.

Albeit brief, the ALJ gave sufficient reasoning concerning the supportability of the opinion and its consistency with the record as a whole, as enumerated in

§§ 404.1527(c)(3)–(4). The ALJ noted that Dr. Jennings cited to Plaintiff's "colorful Native American garb as a clinical finding that demonstrates the severity of [his] symptoms." [AR 665] The ALJ also noted that Dr. Jennings' diagnosis of severe bipolar disorder with periodic manic and psychotic symptoms is not supported by other evidence in the record. [*Id.*] The ALJ reasoned that Dr. Jennings' "treatment notes do not even suggest such a severity of symptoms" and that there was "no evidence to suggest that the claimant's expression of his Native American heritage has any association whatsoever with a mental impairment." [*Id.*]

Review of the record proves this to be the case. As explained *supra*, Dr. Jennings noted that Plaintiff has a mental illness, and later noted that Plaintiff had pleasant behavior, minimal anxious dysphoria, and much improved thought organization. [AR 583] Over a year after Dr. Jennings completed the mental impairment questionnaire, he wrote that Plaintiff "[i]ntermittently struggles with mild depression, episodes of sleep instability, and episodes of irritability. In many ways patient feels like he is coping much more effectively." [AR 888]

As the ALJ stated, these periodic manic and psychotic symptoms do not exist in the record, even in Dr. Jennings' own treatment notes. [AR 665] Nothing in the state agency exams—to which the ALJ gave moderate and significant weight— comport with Dr. Jennings' findings regarding neither the manic and psychotic symptoms nor the reference that Native American clothing are a clinical finding demonstrating the severity of Plaintiff's mental limitations. [AR 84–92, 664]

Plaintiff offers evidence from the record to contrast with the ALJ's decision.

However, a court may not displace the Commissioner's choice between two fairly conflicting views, even if the court would justifiably have made a different choice had the matter been before it de novo. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). Substantial evidence supports the weight the ALJ gave to Dr. Jennings' opinion and as such, the ALJ posed appropriate hypotheticals to the VE.

### C. The ALJ's determination of Plaintiff's credibility

Plaintiff argues that the ALJ must follow the factors set forth in SSR 96-7p when determining Plaintiff's credibility. 1996 WL 374186, (Jul. 2, 1996); ECF No. 12 at 21. Plaintiff points to numerous parts of the record, ostensibly to show that the ALJ did not sufficiently consider these factors when she afforded "less than fully credible" weight to Plaintiff's opinions. *Id.* at 22–24.

Defendant responds by pointing to SSR 16-3p to prove that the ALJ is forbidden from making a generalized credibility assessment and instead must evaluate Plaintiff's "subjective claims in relation to all the evidence, including medical evidence; statements and opinions from physicians and other individuals; and the seven factors outlined in 20 C.F.R. § 404.1529." 2016 WL 1119029, (Mar. 16, 2016); ECF No. 13 at 13. Defendant argues that the ALJ sufficiently complied with SSR 16-3p. *Id.* at 14.

Credibility determinations are particularly suited to the finder of fact and must be supported by substantial evidence. *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010). The ALJ must consider a variety of factors in determining credibility. *Watts v. Berryhill*, 705 F. App'x 759, 763 (10th Cir. 2017). Defendant is

correct in pointing to SSR 16-3p, which superseded SSR 96-7p on March 16, 2016

(the ALJ's most recent decision is dated June 9, 2016). SSR 16-3P, 2016 WL

1119029 (Mar. 16, 2016). SSR 96-7p was superseded to "eliminate the use of the

term 'credibility' and to clarify that subjective symptom evaluation is not an

examination of an individual's character." *Watts v. Berryhill*, 705 F. App'x at 763

n.4 (quoting SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016)) (alterations and

quotations omitted). However, the factors considered are the same. *Id.*

Under SSR 16-3p, the ALJ should consider objective medical evidence and

other evidence including the individual's statements, medical and non-medical

sources, and a variety of factors to consider the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *4–7 (Mar. 16,

2016).

"An ALJ must do more than merely recite the relevant factors, but must give

reasons for the findings linked to the evidence." *Watts v. Berryhill*, 705 F. App'x at

763. The findings must be closely linked to substantial evidence and not a guise of

the findings, but it is not required that the ALJ perform a factor-by-factor recitation

of the evidence. *Id.* (citing cases).

Here, the ALJ noted that Plaintiff's subjective complaints were not

corroborated by treating providers or examiners to whom the ALJ justifiably gave

more weight. [AR 662–664] Plaintiff is right to point out that in his hearings, he

noted ongoing difficulty in school, his struggles with PTSD, his need for his wife's

assistance, and issues with his right knee. ECF No. 12 at 22–23.

However, the ALJ acknowledged these claims, but noted that "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." [AR 655] From there the ALJ noted that Plaintiff's concerns with leaving school and angry outbursts are not present in Dr. Jennings' records. [AR 662] Further, the ALJ compared Plaintiff's self-assessment in his function report to his words in the hearing to show contradictory statements, noting that he stated in his function report that he avoided confrontation, but that in his hearing he would fight in a fight-or-flight situation. [*Id.*] This comports with the consideration of an individual's statement about his symptoms under SSR 16-3p. 2016 WL 1119029, at *5–6.

The ALJ also focused on a discrepancy between Plaintiff's statements and the notes from his treating provider and his caregiver (Dr. Jennings and Ms. Neal, respectively). [AR 661–62]  This comports with the consideration of medical and non-medical sources in SSR 16-3P. 2016 WL 1119029, at *6–7. Concerning his knee, the ALJ relied upon Drs. Boatwright and Davis' opinions which both read that Plaintiff could ambulate and move on and off the examination table without issue. [AR 312, 604] This comports with the consideration of objective medical evidence in SSR 16-3P. 2016 WL 1119029, at *4–5.

Therefore, the ALJ supported her opinion concerning Plaintiff's credibility by substantial evidence.

## VI.    CONCLUSION

ACCORDINGLY, for the foregoing reasons, I AFFIRM the Commissioner's final order.

Dated: July 31, 2018, in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE